1   Robert C. Moest, Of Counsel, SBN 62166
    **THE BROWN LAW FIRM, P.C.**
2   2530 Wilshire Boulevard, Second Floor
    Santa Monica, California 90403
3   Telephone: (310) 915-6628
    Facsimile: (310) 915-9897
4   Email: RMoest@aol.com

5   *Counsel for Plaintiff*

6   [Additional Counsel on Signature Block]

7               **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
8

9   PATRICIA CAPISTRANO, derivatively on          Case No.:
    behalf of ATLASSIAN CORPORATION,
10

11               Plaintiff,                        **DEMAND FOR JURY TRIAL**

12          v.

13  MICHAEL CANNON-BROOKES, SCOTT
    FARQUHAR, ANU BHARADWAJ,
14  CAMERON DEATSCH, SHONA BROWN,
    HEATHER FERNANDEZ, SASAN
15  GOODARZI, JAY PARIKH, ENRIQUE          **VERIFIED SHAREHOLDER**
    SALEM, STEVEN SORDELLO, RICHARD P.     **DERIVATIVE COMPLAINT**
16  WONG, and MICHELLE ZATLYN,

17               Defendants,

18          and

19  ATLASSIAN CORPORATION,

20               Nominal Defendant.

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiff Patricia Capistrano ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Atlassian Corporation. ("Atlassian" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Michael Cannon-Brookes ("Cannon-Brookes"), Scott Farquhar ("Farquhar"), Anu Bharadwaj ("Bharadwaj"), Cameron Deatsch ("Deatsch"), Shona Brown ("Brown"), Heather Fernandez ("Fernandez"), Sasan Goodarzi ("Goodarzi"), Jay Parikh ("Parikh"), Enrique Salem ("Salem"), Steven Sordello ("Sordello"), Richard P. Wong ("Wong"), and Michelle Zatlyn ("Zatlyn") (collectively, the "Individual Defendants," and together with Atlassian, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Atlassian, unjust enrichment, abuse of control, waste of corporate assets, and for contribution under sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants Cannon-Brookes, Farquhar, Bharadwaj, and Deatsch. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Atlassian, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Atlassian's directors and officers from August 5, 2022, to November 3, 2022 (the "Relevant Period").

2.     Founded in 2002, Atlassian creates and markets collaboration and project management software. The Company primarily draws revenue from software licensing and consumer software subscriptions. Atlassian drives growth in two main ways: from users who initially use the software free of

charge but later convert to a paying customer or by already paying customers who increase their existing subscriptions.

3.     Since Atlassian's initial public offering in December 2015, the Company has grown considerably, despite its unique marketing practices. The Company does not utilize direct sales, but rather relies on a "viral marketing model" to contact and acquire new customers. Atlassian depicts this market strategy as "word-of-mouth marketing." To this end, Atlassian normally offers prospective customers free trials, limited free versions of its software, or cheaper beginner licenses "in order to promote additional usage, brand and product awareness, and adoption." For instance, Atlassian's website touts each software product as "always free for 10 users." Once a prospective customer reaches more than 10 users, the prospective customer will need to purchase a subscription. The Company offers three subscription tiers: "Standard," "Premium," and "Enterprise." Price rates increase as more users are added.

4.     In 2020, the Company began to pivot its clients towards cloud computing, which further contributed to Atlassian's fast growing revenues. By the second and third quarters of 2022, however, macroeconomic market conditions soured from worldwide inflation and supply chain disruptions, the Russian invasion of Ukraine, and elongated COVID-19 related lockdowns in China.

5.     In response to these deteriorating conditions, Atlassian's competitors reduced their revenue guidance. Despite this, Atlassian communicated to its shareholders and the overall market that worsening market conditions that were detrimentally affecting its competitors were not having any impact on Atlassian.

6.     For example, on August 4, 2022, Co-Chief Executive Officer ("Co-CEO"), Defendant Farquhar, repeated that Atlassian's guidance of 50% year-on-year cloud growth for fiscal years 2023 and 2024 would not be changed. Later that same day, Defendant Deatsch, the Company's Chief Revenue Officer ("CRO"), told investors that Atlassian was "being exceedingly vigilant watching all stages of our funnel" and that "we have yet to see any specific trend . . . that gives us pause or worry to date." Defendant Deatsch also stated that the "demand for collaboration products continue[s] to be strong."

7.      Powered by these positive statements, investors pushed Atlassian's stock price to new heights. The Company's price per share reached a Relevant Period high of $289.36 per share on August 16, 2022, constituting a 25.6% increase from the Company's stock price just before the Relevant Period.

8.      However, during the Relevant Period, Defendants exaggerated Atlassian's financial guidance by actively hiding the Company's diminishing conversions from prospective customers who use software for free to actual paying customers.

9.      Throughout the Relevant Period, the Individual Defendants personally made and/or caused the Company to make to the investing public a series of materially false and/or misleading statements and omissions, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that Atlassian was enduring detrimental effects from poor macroeconomic conditions and as a result, would have to reduce its future revenue guidance for fiscal years to come.

10.      The truth began to emerge on November 3, 2022, when Atlassian issued a press release accompanied by a shareholder letter in which the Company revealed it had sustained disappointing financial results for the first quarter of 2023, including by failing to reach its earnings per share guidance for the first time in its history as a publicly traded company. Importantly, while the Individual Defendants had reiterated throughout the quarter that the Company was not seeing "any discernible trend [] in terms of the macroeconomic impact," the Company now conceded that the opposite was true. For the first time, Atlassian stated that the first quarter of 2023 financial results were materially and adversely impacted by negative "trends" from "macro headwinds." Further, the Individual Defendants indicated that they knew the "trends" had materialized by the end of July (the first calendar month of the Company's first quarter) by stating "the timing of things that we saw" regarding the negative trends was "July and August," despite making explicit representations to the contrary.

11.      On this astonishing news, the Company's stock price plummeted $50.44, or almost 30%, from a closing of $174.17 per share on November 3, 2022, to close at $123.73 per share on November 4, 2022. In just one day, over $7 billion in shareholder value evaporated.

12.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) macroeconomic conditions were detrimentally impacting the Company's business; (2) the Company was facing slowing conversions from free users to paying customers and that these occurrences established a negative trend for the Company; (3) the Company was generally experiencing a slow-down in paying customer growth; and (4) the Company failed to maintain internal controls. As a result, Defendants statements regarding the performance and financial condition of Atlassian were materially false and misleading at all relevant times.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     In further breach of their fiduciary duties to the Company, two of the Individual Defendants engaged in lucrative inside trading, selling over $66 million of common stock when the price of the Company's common stock was artificially inflated because of the false and misleading statements and omissions discussed herein.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Co-CEOs, its Chief Financial Officer ("CFO"), its CRO, and two of its current directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's, CFO's, CRO's, and various of the directors' liability in the Securities Class Action, of their being beholden to each other and/or certain of the Individual Defendants, and their disinterestedness and/or lack of independence, a majority of the Company's Board of Directors (the Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f) and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because Atlassian is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of 352 shares of Atlassian common stock. Plaintiff has continuously held Atlassian common stock since March 11, 2016.

### Nominal Defendant Atlassian

23.     Atlassian is a Delaware corporation headquartered in California. Atlassian's shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "TEAM."

**Defendant Cannon-Brookes**

24.     Defendant Cannon-Brookes co-founded Atlassian and has served as the Company's Co-CEO and as a director since October 2002. According to the Company's Form 20-F filed with the SEC on August 19, 2022 (the "2022 Annual Report"), Defendant Cannon-Brookes beneficially owns 54,717,824 shares of the Company's Class B common stock, representing 43.94 % of the Company's total outstanding shares. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022 was $187.40, Defendant Cannon-Brookes owned approximately $10.3 billion worth of Atlassian stock. Together, Defendant Cannon-Brookes and Defendant Farquhar collectively own 86.45% of the Company, making them controlling shareholders.

25.     For the fiscal year ending on June 30, 2022 (the "2022 Fiscal Year"), Defendant Cannon-Brookes received $60,211 in total compensation from the Company. This included $54,301 in salary, $436 in benefits, and $5,474 in retirement funds.

26.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Cannon-Brookes made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 4, 2022 | 8,614 | $230.49 | $1,985,397 |
| October 6, 2022 | 8,614 | $241.80 | $2,082,891 |
| October 7, 2022 | 8,614 | $229.52 | $1,977,068 |
| October 10, 2022 | 8,614 | $223.94 | $1,929,062 |
| October 11, 2022 | 8,614 | $211.31 | $1,820,250 |
| October 12, 2022 | 8,614 | $202.82 | $1,747,100 |
| October 13, 2022 | 8,614 | $194.51 | $1,675,534 |
| October 14, 2022 | 8,614 | $198.01 | $1,705,701 |
| October 17, 2022 | 8,614 | $201.19 | $1,733,024 |
| October 18, 2022 | 8,614 | $206.95 | $1,782,701 |
| October 18, 2022 | 8,614 | $206.95 | $1,782,701 |
| October 19, 2022 | 8,614 | $192.53 | $1,658,462 |
| October 20, 2022 | 8,614 | $194.62 | $1,676,491 |
| October 21, 2022 | 8,614 | $190.75 | $1,643,129 |
| October 24, 2022 | 8,614 | $191.88 | $1,652,888 |
| October 26, 2022 | 8,614 | $202.14 | $1,741,216 |
| October 28, 2022 | 8,614 | $195.79 | $1,686,526 |
| October 31, 2022 | 8,614 | $202.50 | $1,744,291 |
| November 3, 2022 | 8,614 | $173.87 | $1,497,698 |

Thus, in total, before the fraud was exposed, he sold 163,666 shares of Company stock on inside information, for which he received approximately $33,522,130 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.     The 2022 Annual Report stated the following about Defendant Cannon-Brookes:

Michael Cannon-Brookies co-founded Atlassian and has served as our Co-Chief Executive Officer and as a member of our board of directors since October 2022. Mr. Cannon-Brookes has also served as an adjunct professor of computer-science & engineering at the University of South Wales, Australia since April 2014. Mr. Cannon-Brookes holds a Bachelor of Commerce in information systems from the University of New South Wales, Australia.

**Defendant Farquhar**

28.     Defendant Farquhar co-founded Atlassian and has served as the Company's Co-CEO and as a director since October 2002. Previously, he also served as the interim CFO of the Company from July 1, 2022 until September 5, 2022. Before that, he served as the Chair of the Board from December 2016 until April 2018. According to the 2022 Annual Report, as of June 30, 2022, Defendant Farquhar beneficially owns 54,717,824 shares of the Company's Class B common stock, representing 43.94 % of the Company's total outstanding shares. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022 was $187.40, Defendant Farquhar owned approximately $10.3 billion worth of Atlassian stock. Together, Defendant Cannon-Brookes and Defendant Farquhar collectively own 86.45% of the Company, making them controlling shareholders.

29.     For the 2022 Fiscal Year, Defendant Farquhar received $95,917 in total compensation from the Company. This included $86,761 in salary, $436 in benefits, and $8,720 in retirement benefits.

30.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Farquhar made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| October 4, 2022 | 8,614 | $230.49 | $1,985,397 |
| October 6, 2022 | 8,614 | $241.80 | $2,082,891 |
| October 7, 2022 | 8,614 | $229.52 | $1,977,068 |
| October 10, 2022 | 8,614 | $223.94 | $1,929,062 |
| October 11, 2022 | 8,614 | $211.31 | $1,820,250 |
| October 12, 2022 | 8,614 | $202.82 | $1,747,100 |

| | | | |
|---|---|---|---|
| October 13, 2022 | 8,614 | $194.51 | $1,675,534 |
| October 14, 2022 | 8,614 | $198.01 | $1,705,701 |
| October 17, 2022 | 8,614 | $201.19 | $1,733,024 |
| October 18, 2022 | 8,614 | $206.95 | $1,782,701 |
| October 18, 2022 | 8,614 | $206.95 | $1,782,701 |
| October 19, 2022 | 8,614 | $192.53 | $1,658,462 |
| October 20, 2022 | 8,614 | $194.62 | $1,676,491 |
| October 21, 2022 | 8,614 | $190.75 | $1,643,129 |
| October 24, 2022 | 8,614 | $191.88 | $1,652,888 |
| October 26, 2022 | 8,614 | $202.14 | $1,741,216 |
| October 28, 2022 | 8,614 | $195.79 | $1,686,526 |
| October 31, 2022 | 8,614 | $202.50 | $1,744,291 |
| November 3, 2022 | 8,614 | $173.87 | $1,497,698 |

Thus, in total, before the fraud was exposed, he sold 163,666 shares of Company stock on inside information, for which he received approximately $33,522,130 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. Additionally, both Defendant Farquhar and Defendant Cannon-Brookes engaged in a concerted inside trading action throughout the month of October 2022 by trading the exact same amounts at the same time for the same price.

31.     The 2022 Annual Report stated the following about Defendant Farquhar:

Scott Farquhar co-founded Atlassian and has served as our Co-Chief Executive Officer and as a member of our board of directors since October 2002 and as chair of our board of directors from December 2016 to April 2018. Mr. Farquhar holds a Bachelor of Science in business information technology from the University of New South Wales, Australia.

**Defendant Bharadwaj**

32.     Defendant Bharadwaj has served as the Company's President since February 2023. Previously, Defendant Bharadwaj served as Chief Operating Officer ("COO") from August 2021 until February 2023. Before that, Defendant Bharadwaj served in various roles at the Company, including Vice President of Product, Head of Product, Atlassian Cloud, Head of Product Strategy, Atlassian and Head of Product, Jira. According to the 2022 Annual Report, as of June 30, 2022, Defendant Bharadwaj beneficially owned 29,533 shares of the Company's Class A common stock. Given that the price per share

of the Company's common stock at the close of trading on June 30, 2022 was $187.40, Defendant Bharadwaj owned approximately $5,534,484 worth of Atlassian stock.

33.     The 2022 Annual Report stated the following about Defendant Bharadwaj:

Anu Bharadwaj has served as our Chief Operating Officer since August 2021. From January 2014 to July 2021, Ms. Bharadwaj served in multiple roles at Atlassian, including Vice President of Product, Head of Product, Atlassian Cloud, Head of Product Strategy, Atlassian and Head of Product, Jira. Prior to joining Atlassian, Ms. Bharadwaj served in various leadership positions at Microsoft, most recently serving as Principal Group Program Manager. Ms. Bharadwaj holds a Bachelor of Engineering in Computer Science from R.V. College of Engineering.

**Defendant Deatsch**

34.     Defendant Deatsch has served as the Company's CRO since March 2020. Previously Defendant Deatsch served in various roles at the Company, including Senior Director of Advocacy, Head of Server Business, Head of Corporate Development, Head of Server and Enterprise Marketing and Head of Growth and Online Sales. According to the 2022 Annual Report, as of June 30, 2022, Defendant Deatsch beneficially owned 19,029 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022 was $187.40, Defendant Deatsch owned approximately $3,566,035 worth of Atlassian stock.

35.     The 2022 Annual Report stated the following about Defendant Deatsch:

Cameron Deatsch has served as our Chief Revenue Officer since March 2020. From October 2012 to March 2020, Mr. Deatsch served in multiple roles at Atlassian, including Senior Director of Advocacy, Head of Server Business, Head of Corporate Development, Head of Server and Enterprise Marketing and Head of Growth and Online Sales. From June 2008 to August 2010, Mr. Deatsch served as a Product Marketing Manager at Jive Software and became their Senior Director of Marketing from June 2010 to October 2012. Mr. Deatsch holds a Master of Business Administration from the University of Montana and a Bachelor of Science in Electrical Engineering from University of California, Davis.

**Defendant Brown**

36.     Defendant Brown has served as a Company director since November 2015 and as Chair of the Board since April 2018. Defendant Brown also serves as a member of the Compensation and Leadership Development Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Brown beneficially owned 31,976 shares of the Company's Class A common stock. Given that

the price per share of the Company's common stock at the close of trading on June 30, 2022 was $187.40, Defendant Brown owned approximately $5,992,302 worth of Atlassian stock.

37. For the 2022 Fiscal Year, Defendant Brown received $390,268 in total compensation from the Company. This included $125,000 in salary and fees and $265,268 in long-term incentives.

38. The 2022 Annual Report stated the following about Defendant Brown:

Shona L. Brown has served on our board of directors since November 2015 and as chair of our board of directors since April 2018. Dr. Brown is currently an independent advisor. She served as a senior advisor to Google Inc. (now known as Alphabet Inc.), an Internet search and technology company, from January 2013 until November 2015. From April 2011 to December 2012, Dr. Brown served as Senior Vice President of Google.org, Google's charitable organization. From 2003 to 2011, Dr. Brown served as Vice President and later as Senior Vice President, Business Operation of Google Inc. From 1995 to 2003, Dr. Brown was a consultant at McKinsey & Company, where she served as a partner from 2000 to 2003. Dr. Brown is currently a director of PepsiCo, Inc., a food and beverage company, and DoorDash, Inc. ("Doordash"), a logistics company, as well as several non-profit organizations. Dr. Brown holds a Bachelor of Computer Systems Engineering from Carleton University, a Master of Arts in philosophy and economics from Oxford University, and a Ph.D. in industrial engineering and industrial management from Stanford University.

## **Defendant Fernandez**

39. Defendant Fernandez has served as a Company director since November 2015. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Fernandez beneficially owned 14,606 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022 was $187.40, Defendant Fernandez owned approximately $2,737,164 worth of Atlassian stock.

40. For the 2022 Fiscal Year, Defendant Fernandez received $320,268 in total compensation from the Company. This included $55,000 in salary and fees and $265,268 in long-term incentives.

41. The 2022 Annual Report stated the following about Defendant Fernandez:

Heather Mirjahangir Fernandez has served on our board of directors since November 2015. Ms. Fernandez is the Chief Executive Officer and co-founder of Solv., a private company focused on connecting consumers and healthcare providers using technology solutions. From January 2014 to August 2015, Ms. Fernandez served as Senior Vice President and General Manager of Business Services at Trulia, Inc., an online residential real estate site, which was acquired by Zillow, Inc. in 2015. From August 2006 to January 2014, Ms.

Fernandez served in various other senior management positions in sales and marketing at Trulia, Inc. Prior to Trulia, Inc., Ms. Fernandez was an advisor at Morgan Stanley and Director of the Impact Group at Blanc & Otus. Ms. Fernandez holds a Bachelor of Arts in political science from University of California, Berkeley and a Master of Business Administration from Stanford University Graduate School of Business.

**Defendant Goodarzi**

42.     Defendant Goodarzi has served as a Company director since April 2018. Defendant Goodarzi also serves as the chair of the Compensation and Leadership Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Goodarzi beneficially owned 12,090 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022 was $187.40, Defendant Goodarzi owned approximately $2,265,666 worth of Atlassian stock.

43.     For the 2022 Fiscal Year, Defendant Goodarzi received $335,268 in total compensation from the Company. This included $70,000 in salary and fees and $265,268 in long-term incentives.

44.     The 2022 Annual Report stated the following about Defendant Goodarzi:

Sasan Goodarzi has served on our board of directors since April 2018. Mr. Goodarzi has served as Chief Executive Officer of Intuit Inc. ("Intuit"), a financial software company, since January 2019. During his 14 years with Intuit, Mr. Goodarzi has successfully led each of Intuit's largest businesses. From May 2016 to January 2019, Mr. Goodarzi was Executive Vice President and General Manager of Intuit Small Business Group. From 2004 to 2010, Mr. Goodarzi was Senior Vice President and General Manager for Intuit's ProTax division and Intuit Financial Services. Prior to Intuit, Mr. Goodarzi worked for Invensys, a global provider of industrial automation, transportation and controls technology, serving as Global President of the Products group. He also held a number of senior leadership roles in the automation control division at Honeywell and served as the Chief Executive Officer and co-founder of a technology startup, Lazer Cables Inc. Mr. Goodarzi earned his Bachelor of Science degree in electrical engineering at the University of Central Florida and a Master of Business Administration from the Kellogg School of Management at Northwestern University.

**Defendant Parikh**

45.     Defendant Parikh has served as a Company director since July 2013. Defendant Parikh also serves as a member of the Compensation and Leadership Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Parikh beneficially owned 20,756 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading

on June 30, 2022, was $187.40, Defendant Parikh owned approximately $3,889,674 worth of Atlassian stock.

46. For the 2022 Fiscal Year, Defendant Parikh received $320,268 in total compensation from the Company. This included $55,000 in salary and fees and $265,268 in long-term incentives.

47. The 2022 Annual Report stated the following about Defendant Parikh:

Jay Parikh has served on our board of directors since July 2013. Mr. Parikh has served as the co-Chief Executive Officer of Lacework, Inc. ("Lacework"), a cloud security company, since August 2021. Mr. Parikh previously served as Vice President of Global Engineering and Infrastructure at Facebook, Inc. from November 2009 till February 2021. From October 2007 to October 2009, Mr. Parikh served as Senior Vice President, Engineering & Operations at Ning, Inc., a social networking company. From April 1999 to October 2007, Mr. Parikh served as Vice President of Engineering at Akamai Technologies, Inc., a cloud services provider. Mr. Parikh holds a Bachelor of Science in mechanical engineering from Virginia Tech.

**Defendant Salem**

48. Defendant Salem has served as a Company director since July 2013. Defendant Salem also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Salem beneficially owned 131,563 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022, was $187.40, Defendant Salem owned approximately $24,654,906 worth of Atlassian stock.

49. For the 2022 Fiscal Year, Defendant Salem received $340,268 in total compensation from the Company. This included $75,000 in salary and fees and $265,268 in long-term incentives.

50. The 2022 Annual Report stated the following about Defendant Salem:

Enrique Salem has served on our board of directors since July 2013. Mr. Salem has served as a Managing Director of Bain Capital Ventures since July 2014. From April 2009 to July 2012, Mr. Salem served as President, Chief Executive Officer and a director of Symantec Corporation, a cybersecurity company. From June 2004 to April 2009, Mr. Salem served in various other senior management positions at Symantec Corporation. From April 2002 to June 2004, Mr. Salem served as the President and Chief Executive Officer of Brightmail, Inc., an email filtering company, which was acquired by Symantec Corporation in 2004. Mr. Salem is currently a director of Mandiant Inc., a network security company, DocuSign, Inc., an esignature solutions company, and several private companies. Mr. Salem previously served as a director of ForeScout Technologies, Inc., a cybersecurity company,

from September 2013 until its sale to Ferrari Group Holdings, L.P. in August 2020. Mr. Salem holds a Bachelor of Arts degree in computer science from Dartmouth College.

**Defendant Sordello**

51.     Defendant Sordello has served as a Company director since November 2015. Defendant Sordello also serves as a member of the Audit Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Sordello beneficially owned 45,990 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022, was $187.40, Defendant Sordello owned approximately $8,618,526 worth of Atlassian stock.

52.     For the 2022 Fiscal Year, Defendant Sordello received $360,268 in total compensation from the Company. This included $95,000 in salary and fees and $265,268 in long-term incentives.

53.     The 2022 Annual Report stated the following about Defendant Sordello:

Steven Sordello has served on our board of directors since November 2015. From July 2007 to January 2022, Mr. Sordello served as the Senior Vice President and Chief Financial Officer of LinkedIn Corporation ("LinkedIn"), an online business-oriented social networking service, which was acquired by Microsoft in 2016. From August 2006 to July 2007, Mr. Sordello served as Chief Financial Officer of TiVo, Inc., a manufacturer of digital video recorders. From May 1999 to October 2005, Mr. Sordello served in several roles, including as Chief Financial Officer, at Ask Jeeves, Inc., an internet search engine company, which was acquired by IAC in 2005. Prior to that, Mr. Sordello served in various finance roles at Adobe Systems Incorporated, a software company, and Syntex Corporation, a pharmaceuticals company, which was acquired by Roche Pharmaceuticals in 1994. Mr. Sordello also serves as a director at Compass, a real estate technology company. Mr. Sordello previously served as a director of Cloudera, Inc., a cloud software company, from September 2014 to January 2019. Mr. Sordello is currently a member of the board of trustees of Santa Clara University. Mr. Sordello holds a Master of Business Administration and a Bachelor of Science in business from Santa Clara University.

**Defendant Wong**

54.     Defendant Wong has served as a Company director since July 2010. Defendant Wong also serves as the chair of the Nominating and Corporate Governance Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Wong beneficially owned 146,966 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the

close of trading on June 30, 2022, was $187.40, Defendant Wong owned approximately $27,541,428 worth of Atlassian stock.

55. For the 2022 Fiscal Year, Defendant Wong received $330,268 in total compensation from the Company. This included $65,000 in salary and fees and $265,268 in long-term incentives.

56. The 2022 Annual Report stated the following about Defendant Wong:

Richard P. Wong has served on our board of directors since July 2010. Mr. Wong has served as a General Partner to Accel Partners, a venture capital firm, since December 2006. From January 2001 to November 2006, Mr. Wong held a number of executive roles at Openwave Systems Inc., a mobile software company, including Senior Vice President of Products and Chief Marketing Officer. Mr. Wong is currently a director of UiPath, Inc., a software development tool company, a position he has held since April 2018, and a number of other private companies. Mr. Wong previously served as a director of SunRun Inc., a solar energy company, from July 2009 to March 2018. Mr. Wong holds a Master of Management from the MIT Sloan School of Management and a Bachelor of Science in materials science and engineering from the Massachusetts Institute of Technology.

**Defendant Zatlyn**

57. Defendant Zatlyn has served as a Company director since September 2021. Defendant Zatlyn also serves as a member of the Audit Committee. According to the 2022 Annual Report, as of June 30, 2022, Defendant Zatlyn beneficially owned 163 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on June 30, 2022, was $187.40, Defendant Zatlyn owned approximately $30,546 worth of Atlassian stock.

58. For the 2022 Fiscal Year, Defendant Zatlyn received $373,391 in total compensation from the Company. This included $45,435 in salary and fees and $327,956 in long-term incentives.

59. The 2022 Annual Report stated the following about Defendant Zatlyn:

Michelle Zatlyn has served on our board of directors since September 2021. Ms. Zatlyn is a co-founder of Cloudflare, Inc. ("Cloudflare"), a cloud services provider, where she has served as its Chief Operating Officer since 2016 and its President since 2020. From 2009 to 2016, Ms. Zatlyn served as Head of User Experience of Cloudflare. Ms Zatlyn has also served as a member of the board of directors of Cloudflare since 2009. Ms. Zatlyn holds a B.Sc. in Chemistry and Business from McGill University and an M.B.A. from Harvard Business School.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.     By reason of their positions as officers, directors, and/or fiduciaries of Atlassian and because of their ability to control the business and corporate affairs of Atlassian, the Individual Defendants owed Atlassian and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Atlassian in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Atlassian and its shareholders so as to benefit all shareholders equally.

61.     Each director and officer of the Company owes to Atlassian and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Atlassian, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of Atlassian were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Atlassian, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Atlassian's Board at all relevant times.

65.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with applicable laws.

66.     To discharge their duties, the officers and directors of Atlassian were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Atlassian were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Atlassian's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Atlassian conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Atlassian and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Atlassian's operations would comply with all applicable laws and Atlassian's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.  Each of the Individual Defendants further owed to Atlassian and the shareholders the duty of loyalty requiring that each favor Atlassian's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

68.  At all times relevant hereto, the Individual Defendants were the agents of each other and of Atlassian and were at all times acting within the course and scope of such agency.

69.  Because of their advisory, executive, managerial, directorial, and controlling positions with Atlassian, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

70.  The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Atlassian.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.  In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired

with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (3) artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Atlassian was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

## ATLASSIAN'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Code of Conduct*

75.     Atlassian's Code of Conduct opens by stating that the Company "takes compliance with applicable laws, rules, and regulations seriously."

76.     The Code of Conduct further states that each of the Company's "employees, directors, officers, agents, partners, representatives, contractors, and consultants" "has a part to play" in being "responsible for behaving ethically, honestly, and respectfully."

77.     Regarding legal compliance, the Code of Conduct states the following:

Atlassian takes compliance with applicable laws, rules, and regulations seriously. You are prohibited from engaging in any unlawful activity when conducting Atlassian business or in carrying out your day-to-day duties or services. It is your responsibility to read, understand, and acknowledge this Code (including the policies, standards, and guidelines referenced in the Code) on an annual basis or as requested by Atlassian. This Code does not change any legal or contractual obligations that you may otherwise have with Atlassian. Instead, the standards in this Code should be viewed as the minimum standards that Atlassian expects from you. Also, as a global company, Atlassian expects that you will comply with all local laws and customs of the location where you work or visit.

78.     Regarding "Insider Trading," the Code of Conduct states the following, in relevant part:

If you learn of any material, nonpublic information about Atlassian or any other company (for example, a customer, supplier, or other party with which Atlassian is negotiating a major transaction, such as an acquisition, investment, or sale), you may not trade in Atlassian's securities or that other party's securities or "tip" others who might make an investment decision based on such information until the information becomes public or is no longer material.

79.     Under the "Conflicts of Interest" section, the Code of Conduct provides:

You have an obligation to conduct Atlassian's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any transaction or relationship that reasonably could be expected to give rise to a conflict of interest should be reported promptly to the Compliance Officer. The Compliance Officer may notify the Board of Directors or its Audit Committee as they deem appropriate.

Members of the Board of Directors should disclose actual or potential conflicts of interest in accordance with Atlassian's Policy – Related Person Transactions and, if necessary, seek the appropriate authorization for the conflict situation. Actual or potential conflicts of interest involving an executive officer other than the Compliance Officer should be disclosed directly to the Compliance Officer. Actual or potential conflicts of interest involving the Compliance Officer should be disclosed directly to the Chief Financial Officer.

80.     The Code of Conduct section on "Quality of Public Disclosures" states:

Atlassian is committed to providing its stockholders with information about its financial

condition and results of operations as required by the securities laws of the United States. It is Atlassian's policy to provide full, fair, accurate, timely, and understandable disclosures in its public communications, including the reports and documents that it submits to the Securities and Exchange Commission and other authorities. Officers, employees, consultants, contractors, and others working on behalf of the company who are involved with these filings and disclosures, including Atlassian's principal executive, financial, and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically, and objectively in order to ensure that this disclosure policy is fulfilled and maintain familiarity with the disclosure requirements, processes and procedures that apply to Atlassian. You must not knowingly misrepresent, omit or cause others to misrepresent or omit, materials facts about Atlassian to others, including Atlassian's inependent auditors, governmental regulators and self-regulator organizations. Members of Atlassian's Disclosure Committee are primarily responsible for monitoring the company's public disclosures.

81. Regarding "Questions and Reporting Potential Violations," the Code of Conduct states:

We rely on you to recognize potential problems and ask questions if you are ever unsure about the appropriateness of an action or occurrence. Whenever you are unsure, always ask.

We want to ensure that Atlassian is a place where our team can thrive. We expect you to follow basic, common-sense rules of conduct that will protect everyone's interests. If you are found to have violated this Code or any of the policies or practices referenced in it, you will be subject to disciplinary action, up to and including termination of your employment or services.

82. In a section titled, "No Insider Trading," the Code of Conduct states:

If you learn of any material nonpublic information about Atlassian or a company with which Atlassian does business (for example, a customer, supplier, or other parties with which Atlassian is negotiating a major transaction, such as an acquisition, investment, or sale), you may not trade in Atlassian's securities or that other party's securities or "tip" others who might make an investment decision based on such information until the information becomes public or is no longer material. In simple terms, material nonpublic information is any type of information that could reasonably be expected to affect the market price of Atlassian's securities or a third party's securities, as the case may be, that has not been disseminated in a manner making it available to investors generally. Trading stock or encouraging others to trade stock on the basis of material nonpublic information, regardless of how small or large the trade, may constitute insider trading, insider dealing, or stock tipping and constitute a criminal offense in most countries where we do business and a violation of U.S. federal securities law. Like many public companies, Atlassian has adopted specific trading restrictions to guard against insider trading. Do not confuse these trading restrictions with the broader prohibition on trading when in possession of material nonpublic information. In other words, the company's "trading window" may be open but you may nonetheless be in possession of material nonpublic information that makes it

inappropriate to trade. For more information, please read Policy – Insider Trading and Disclosure.

83.     In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof.  In violation of the Code of Conduct, the Individual Defendants also failed to conduct business in an honest and ethical manner and properly report violations of the Code of Conduct.

## **ATLASSIAN'S AUDIT COMMITTEE CHARTER**

84.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> - oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
>
> - take, or recommend that the Board take, appropriate action to oversee (1) the qualifications, independence and performance of the Company's independent auditors, and (2) the performance of the Company's internal audit function;
>
> -prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement; and
>
> -oversee and review the Company's guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.;

85.     In a section titled "Audited Financial Statements and Annual Audit," the Audit Committee Charter states that the Audit Committee "The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditors and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive")." The section further states that the Audit Committee shall do the following:

The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors, the Company's annual audited financial statements, including (1) all critical accounting policies and practices used or to be used by the Company, (2) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

86.     In the same section, the Audit Committee Charter states that the Audit Committee "must review" "major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies" and "major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles."

87.     Later in the same section, the Audit Committee Charter states the following:

If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer(s) and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

88.     Regarding "Earnings Press Releases," the Audit Committee Charter states that the Audit Committee "shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made."

89.     Regarding "Risk Assessment and Management," the Audit Committee Charter states the following:

The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management, including a review of the Company's enterprise risk management framework.

In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major risk exposures, including financial, operational, data privacy, cybersecurity,

competition, legal, regulatory, tax and accounting risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

90.     In violation of the Audit Committee Charter, Defendants Salem, Sordello, Fernandez, and Zatlyn failed to adequately review and discuss the Company's quarterly shareholder letters, annual reports on Form 20-F, and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

### THE INDIVIDUAL DEFENDANTS' MISCONDUCT

#### Relevant Background

91.     Atlassian was founded in October 2002 by Defendants Cannon-Brookes and Farquhar, operating as a public limited liability company incorporated under the laws of England and Wales under the name "Atlassian Plc." On or around December 10, 2015, the Company held an initial public offering ("IPO") on the NASDAQ. At that time, Atlassian's market capitalization hovered around $4.5 billion, but quickly soared to more than $40 billion by the start of the Relevant Period.

92.     On July 1, 2022, the Company changed its name and was incorporated by the filing of its Certificate of Incorporation in Delaware. On September 30, 2022, the Company moved its corporate domicile from the United Kingdom to the United States to "increase our access to a broader set of investors, support inclusion in additional stock indices, improve financial reporting comparability with industry peers, streamline [the Company's] corporate structure, and provide more flexibility in accessing capital." On that day, Atlassian Plc became a subsidiary of the Company.

93.     Atlassian is a software company that designs and markets collaboration products which aid individuals that work together in businesses and across businesses. The Company also publicly heralds its "core values," which are prominently placed on the Company's website and Annual Reports:

     

Open company, no bullshit   Play, as a team   Build with heart & balance   Be the change you seek   Don't #@!% the customer

94.    As part of its "core values," the Company claims to "value transparency and openness as an organization." To achieve this end, Atlassian disperses quarterly shareholder letters to update the market about the Company's performance and future guidance. Defendant Cannon-Brookes described the shareholder letter in an August 2018 interview as what he "spend[s] the most amount of time on in communicating what we're thinking, [and] where we're going." He further elaborated that the shareholder letter honors Atlassian's "core values" by allowing the Company to be "open and no bull**** when we write the shareholder letter."

### Atlassian's Unique Business Model

95.    Atlassian utilizes a unique business model to grow its revenues. Unlike other software companies that use commission-based sales teams, Atlassian depends upon website traffic to make sales. Atlassian attempts to grow its business through subsets. For example, when a small group inside of a larger company begins to use an Atlassian product, Atlassian's business model is designed to have the product "spread to other technical and non-technical teams through cross-functional collaboration." In the last few years, the Company has doubled down on this model as more of its customers use its products via Atlassian's cloud instead of using software which is downloaded on a customer's own servers and hardware.

96.    Atlassian announced in October 2020 that the Company would entirely stop selling "on premises" server-based products by February 2022, and would stop maintaining support for on premises versions of its products by February 2024. Consequently, many new customers would have to use Atlassian products by cloud connection only, and already-existing customers would need to transition from hardware to the cloud or face the possibility the products they use become unserviceable by Atlassian in the future.

97.    Indeed, the market has closely monitored Atlassian's cloud-based revenue growth because of this dramatic transition to cloud computing.

98.    Atlassian's revenue growth relies on two intertwined but distinct components. First, Atlassian permits the free use of the standard version of its products to the first ten users of an organization. In turn, Atlassian creates revenue by requiring a free user to pay for a premium version of its products or

by charging an organization when more than ten of the organization's people use a standard version of an Atlassian product. The Company calls the latter revenue stream "free to paid conversions."

99.     Atlassian then brings in revenue from existing, subscription-paying customers. When a paying customer needs more members of its organization to be added to use Atlassian's products, either by a simple increase of users or by the increased use of more of Atlassian's products, the Company requires the paying customer to pay more. Atlassian calls this revenue stream as "paid seat expansion" and describes it in the following way: "[o]nce we have landed within a customer team, the networked nature and flexibility of our products tend to lead to adoption by other teams and departments, resulting in user growth, new use cases, and the adoption of our other products."

100.    "Paid seat expansion" is the much larger revenue source for Atlassian, constituting approximately ninety percent of the Company's expansion revenues. In other words, Atlassian's revenues primarily come from already existing customers. On June 1, 2023, Atlassian's Head of Investor Relations stated during a call with analysts that "seat expansion within existing customers within existing products . . . [has] always been the biggest driver of growth across all products." Further, Atlassian has conceded that its financial "success is dependent on our ability to expand the relationship with our existing base of customers through the addition of more users, teams and products."

101.    Before the Relevant Period, the Individual Defendants emphasized to investors that Atlassian's paid seat expansion revenue growth supplied the Company with long-term growth prospects. For instance, on June 28, 2021, Defendant Deatsch stated that the Company's "short term revenue" stems from "expanding" its relationship with already paying customers, describing that "the bulk of Atlassian's revenue has nothing to do with the customers we acquire this year, it is about all the customers that have been with us, 2, 3, 5, 10 years and how we continue to expand our footprint with those accounts." Likewise, on the Company's April 28, 2022 earnings call regarding Atlassian's third quarter of 2022 performance, former CFO James Beer stated that "we land small and expand very significantly over time . . . we gradually get larger and larger in terms of what we do for our customers. And I think that altogether gives us a lot of runway for long-term growth."

102.    Notably, well before the Relevant Period began, Defendants frequently told investors that Atlassian's "linear sales cycle" gave the Company "predictability of sales" that separated Atlassian from software competitors. As early as Atlassian's IPO, the Individual Defendants touted the Company's business model in respect to its sales structure as "unique" to the software industry. Atlassian characterizes its strategy as a "linear sales cycle." In particular, in the Company's IPO prospectus filed with the SEC on December 10, 2015, the Individual Defendants boasted about Atlassian's "[p]redictability of [s]ales" by stating "[s]ince we do not rely on an expensive salesforce and complex pricing negotiations to add new customers but focus on a high-velocity online distribution model with affordable pricing, our sales have grown linearly as we have attracted new users for our products." Therefore, "[u]nlike traditional enterprise software businesses, we have historically experienced a linear quarterly sales cycle with approximately a third of our quarterly sales occurring within each month of the respective quarter." The IPO prospectus featured a graph explaining linear sales which had no variance of revenue from quarter to quarter:



103.    Since then, the Individual Defendants have repeatedly touted the Company's "predictability of sales" to investors and the public, such as during investor conferences and in SEC filings. For instance, in every Atlassian annual report since the IPO, including the 2022 Annual Report that was filed on August 19, 2022, Atlassian bragged about the benefits it enjoys from having the same

"[p]redictability of sales," because "we are not dependent on a traditional sales force… we have historically experienced a linear quarterly sales cycle."

104.    For instance, during a September 13, 2017 Analyst Day conference, Atlassian's former CFO, Murray Demo, emphasized his "favorite slide," pictured below, which boasted about Atlassian's "[p]redictable sales model" because of the Company's "linearity of sales." He also specifically stated to analysts that "that's how linear our business is," which "really helps us inquarter to understand where we're at financially" and "puts us in a position where we're really in a no-surprise environment from a top line perspective":



105.    Per Atlassian's former President, Jay Simons, linearity of sales greatly comforted the Company's management since there was no need to "sweat" the Company's quarter-end periods to meet sales forecasts because the Individual Defendants had knowledge during any quarter how the Company was performing, both in terms of general operations and financial performance. During a UBS Global Technology Conference on November 13, 2017, Jay Simons stated the Company was "pretty radically

different" from other companies because Atlassian did not have seasonality in sales. Specifically, he stated that Atlassian "plots the linearity of billings, not revenue, but actual billings," and through "the last 8 quarters…they're just basically straight lines, like up and to the left." Consequently, the "leaders of the company [are] not sweating the last 2 or 3 weeks of a quarter trying to figure out whether or not people had forecasted things correctly or if one deal slipped, trying to figure out how we can pull next deals quarters in to kind of offset."

106.    A little less than two years later, during an "Atlassian Summit" held on April 10, 2019, Atlassian's former CFO, James Beer, emphasized a slide which stated the Company's "business within a given quarter continues to be remarkably linear." Importantly, former CFO Beer explicitly stated that the"relatively smooth levels of activity during a quarter" was "really quite different to the case of so many other enterprise software companies" and "helps us with predictability":



***Macroeconomic Conditions Raise Concerns for Investors and Analysts***

107.    Despite macroeconomic conditions deteriorating before and into the Relevant Period, Atlassian's management kept telling investors that Atlassian's linear sales cycle shielded the Company from poor macroeconomic conditions. In fact, shortly before the commencement of the Relevant Period, on June 2, 2022, an analyst inquired to Atlassian's Head of Investor Relations, Martin Lam, about the "elephant in the room [that] has been the macro." Lam replied, "we have this beautiful linearity throughout

our quarter given the bookings on our board," which permits Atlassian to "look at bookings on an ongoing basis" and therefore stay current with its trends throughout the quarters.[1]

108.    By early 2022, the global economy experienced a slowdown. Worldwide inflation and supply chain disruptions affected the international economy as a side effect of the ending of the COVID-19 pandemic, Russia further destabilized the world by invading Ukraine, and elongated COVID-19 related lockdowns in China collectively compounded the issues for businesses around the world. In this context, investors sought assurances from Atlassian that the Company would not be hampered by these global issues.

109.    The market rewarded the Individual Defendants for their representations about Atlassian's imperviousness to poor macroeconomic conditions. On August 4, 2022, Raymond James stated that Atlassian was "feeling little impact from macro uncertainty that is causing budget tightening around the broader technology space" and "[w]hile top of the funnel free users may not convert to paid users as readily right now, the vast majority of sales come from existing customers and TEAM has world-class retention."

110.    Wolfe Research echoed Raymond James' praises, stating on the same day that the "cherry on top was reaffirmation of basically zero impacts from macro (outside of slight decrease in free to pay conversion rates)"; and consequently, Wolfe Research "believe[d] the after hours premium to peers is justified." Oppenheimer & Co. left Atlassian's August 4, 2022 entranced as well, stating they felt "bullish" since "the company is seeing minimal macroeconomic weakness."

111.    Importantly, analysts explicitly stressed the Individual Defendants' claims that Atlassian did not endure or identify any negative "trends" inflicted by poor macroeconomic conditions. For instance, SMBC Nikko Securities ("SMBC") stated that the Company's "narrative was unabashedly positive" as "[m]anagement has 'yet to see any trend' in geographies or customer segments that indicate macro-driven

---

[1] Moreover, a former Company employee who had worked as a Senior Support Engineer for Atlassian from March 2022 until March 2023 was interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as "CW 1." CW 1 represented that there was no "seasonality" in Atlassian's software business model. CW 1 elaborated that "there is no more or less work done in any month of the year and companies are constantly improving their software." In fact, CW 1 laughed when questioned about "software seasonality," stating that in more than fifteen years as a software engineer, he has never heard of nor experienced software seasonality.

weakness," and highlighted that Atlassian "has not seen any broader slowdowns among specific products, geographies, industries, or customer sizes."

112.    Truist believed the Individual Defendants too, announcing that Atlassian was "one of the key companies that we look to for macro commentary" and that, "[w]hile other companies in our coverage have discussed headwinds by geography, vertical, or customer size, [Atlassian] did not indicate any difference in buyer behaviors."

113.    Similarly, Cowen stated that Atlassian witnessed "consistent demand trends," and "is not seeing any notable macro pressures in pipelines/close rates." Canaccord Genuity asserted that for Atlassian, "all regions, industry segments, product segments, and customer segments remain healthy and are behaving normally."

114.    Likewise, Macquarie determined that Atlassian was "resilient in a downturn" because the Company showed "little to no impacts from the macro environment." Macquarie further stated that the Company "provided the strongest print of this software earnings season in our coverage as the company handily beat expectations, raised vs. FQ1'23e consensus, reiterated strong cloud growth outlook, and provided reassuring commentary about its positioning for a recession."

115.    William Blair announced that "[m]acro impact on demand and pipeline was minimal," and stated as a "**key highlight**[]" that Atlassian reported "***No material macro impact coming through the business***." (emphasis in original). William Blair also explicitly referenced the Individual Defendants representations about their personal knowledge and activity in these concerns, stating that the Company "has been vigilant in monitoring the macroeconomic environment and has not seen any material signs of a slowdown in its data yet."

116.    As a consequence of the Individual Defendant's positive statements, Atlassian's stock price per share soared to a Relevant Period peak of $289.36 per share on August 16, 2022, constituting a 25.6% increase from the price per share on August 4, 2022, one day before the start of the Relevant Period.

**False and Misleading Statements**

***The Q4 2022 Shareholder Letter***

117.    On August 4, 2022, after the market closed, Atlassian filed a Current Report with the SEC on Form 6-K which included the fourth quarter of 2022 shareholder letters ("Q4 2022 Shareholder Letter"). The Q4 2022 Shareholder Letter was signed by Defendants Cannon-Brookes and Farquhar.

118.    The Q4 2022 Shareholder Letter referenced "headlines reporting macroeconomic volatility." However, the Q4 2022 Shareholder Letter told investors that Atlassian was "uniquely positioned [with] deep-seated momentum and a differentiated business" because: (1) "developers tend to be the last roles companies scale back on"; (2) Atlassian's products are a "relatively small line item in overall IT budgets and likely not where customers look to reduce costs"; and (3) "customers tell us that Atlassian products are mission critical for them."

119.    The Q4 2022 Shareholder Letter further comforted investors by stating that Defendants Cannon-Brookes and Farquhar would "continue to scan the horizon for warning signs and be candid with investors as we have throughout our six+ years as a public company."

120.    Defendants Cannon-Brookes and Farquhar stated in the Q4 Shareholder Letter that "[o]nce customers land with us, we can identify those with the highest expansion potential with surgical precision and focus our high-touch tactics on those organizations." The Q4 Shareholder Letter also mentioned Atlassian's core "value" of "Open company, no bullshit."

121.    Importantly, the Q4 2022 Shareholder Letter explicitly told the market, five weeks into the first quarter of 2023, that there were no negative trends affecting the Company's current quarter. The Q4 2022 Shareholder Letter provided that "over 90% of our revenue in FY22 was derived from existing customers and this dynamic has been consistent in our business over the years," and "our expectations that Cloud revenue growth will be approximately 50% year-over-year for both FY23 and FY24." Lastly, the Q4 2022 Shareholder Letter suggested a possible "modest decrease in the conversion rates of Free instances upgrading to paid plans," but assured investors that "nothing we are seeing right now has changed our outlook."

***August 4, 2022 Press Release***

122.    Atlassian also attached a press release to the Q4 2022 Shareholder Letter on August 4, 2022. In the press release, the Company outlined "financial targets" for the first quarter of fiscal year

2023, one of which was net income per diluted share. The press release stated that Atlassian "expected [this figure] to be approximately $0.37 to $0.38 per share."

### August 4, 2022 Conference Call

123.    On August 4, 2022, the Company hosted a conference call with investors to discuss its fourth quarter of 2022 financial results that explicitly discussed the assertion that macroeconomic conditions were not affecting Atlassian's bottom line and future guidance. During the call, Quinton Gabrielli, a Piper Sandler analyst, asked about the "macro impact that you are seeing in the business" and Atlassian's signaling of slower conversion of free users to paying customers. Defendant Deatsch replied, "across the many funnels we operate, whether that's our migrations, our editions upgrades, our cross-sell products, our overall retention continues to be exceedingly strong." He elaborated, "what you see is existing customers continue to have demand for what our products to help their teams work more productively" and that Atlassian would continue "to be vigilant. We have multiple analytics teams, multiple growth teams, as well as our onboarding and R&D teams that are focused on ensuring that those customers remain active, and that gives us more chances to convert them to paid plans in the future."

124.    During the call, Atlassian reported a "modest decrease in the conversion rates of Free instances upgrading to paid plans," however, the "free to paid" part of the Company's business only constituted 10% of the overall business. The Defendants maintained that this "modest decrease" was not important and would not negatively impact the Company's business. When a Wolfe Research analyst asked why Atlassian was not "seeing kind of some of the other impacts [] other companies are seeing?," Defendants maintained that the "slightly lower rate" of conversions was not important and did not negatively impact the business. In particular, Defendant Deatsch stated that the "slight thing" Atlassian saw in free-to-paid conversions "does not take away from the continued growth we see in our existing customer base that also drives more than 90% of our revenue in the existing year." He went on to say that the Company's "overall retention continues to be exceedingly strong" "across the many funnels we operate," which had "been supporting our net expansion rate." With these responses, Defendant Deatsch clearly signaled to investors that the decrease in free-to-paid customers was not significant or damaging to Atlassian.

125.   Also, during the call, another analyst inquired about the "demand side" and whether "there is one specific place that you're maybe keeping your eye on more than the others?" Defendant Deatsch replied, "we are being exceedingly vigilant across watching all stages of our funnel, the additions upgrades, retention rates and, of course, our new customers coming in" and that "[t]he good news as of to date is we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause to worry to date. So, something we continue to watch like a hawk, but there is no new news to share today."

126.   Defendant Deatsch also reiterated the contents of the Q4 Shareholder Letter during the call by personally reassuring investors that Atlassian's top management was diligently watching the effects of macroeconomic conditions and would "continue to watch [these metrics] like a hawk."

127.   Later in the call, Defendant Deatsch stated, "we have not seen any significant shift in customer demand across our product lines. … Jira Software, Confluence, Trello, you name it, continue to see strong demand across the board as we continue to see people embracing digital transformation and needing tools to help." In sum, Defendant Deatsch stated, "we continue to see demand for collaboration products that continue to be strong."

128.   The statements in paragraphs ¶¶ 117-127 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, contrary to the Individual Defendants' positive representations that Atlassian had "yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date"; that they had "not seen any significant shift in customer demand across our product lines"; and that there was "no new news to share today," in actuality, the absolute opposite was happening. In fact, the Individual Defendants later admitted when the truth was revealed, that at the same time the Individual Defendants were making these positive statements, Atlassian was experiencing material adverse "trends" due to "macro headwinds" in both integral parts of its business—essentially, the rate of free users becoming paying customers and rate of already existing paying customers increasing their subscriptions.

129.   In particular, when the truth was revealed, the Individual Defendants admitted that "a decrease in the rate of Free instances converting to paid plans" was a material "trend" that "became more pronounced in Q1" and would have an "impact" on "future revenue growth." Additionally, it was materially misleading for the Individual Defendants to cite to "continued growth we see in our existing customer base" to comfort investors' worries about macroeconomic issues, when the Individual Defendants actually admitted that they were already witnessing a "trend" of a "slowing in the rate of paid user growth" when these statements were made. When the truth fully emerged, the Individual Defendants admitted that they had seen both of these negative "trends" impacting Atlassian's business since July 2022.

### August 19, 2022 Annual Report

130.   On August 19, 2022, Atlassian filed its 2022 Annual Report with the SEC on Form 20-F, which Defendants Cannon-Brookes and Farquhar signed. At the same time, Atlassian also filed a Form S-8 Registration Statement that incorporated the 2022 Annual Report. As part of the Form S-8, Defendants Cannon-Brookes and Farquhar signed certifications attesting to their accuracy.

131.   Importantly, the 2022 Annual Report stated that "[o]ther than as disclosed elsewhere in this Annual Report, we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions."

132.   The statements in paragraphs ¶¶ 130-131 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, contrary to the Individual Defendants' unequivocal statement that they were not "not aware of any trends" in "the current fiscal year that are reasonably likely to have a material effect on our revenues" or "that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions," in actuality, the absolute opposite was true. In fact, the Individual Defendants later admitted when the truth was revealed, that at the same time the Individual Defendants were making these positive statements, Atlassian was experiencing material adverse "trends"

due to "macro headwinds" in both integral parts of its business—essentially, the rate of free users becoming paying customers and rate of already existing paying customers increasing their subscriptions.

### *September 14, 2022 Goldman Sachs Communacopia Technology Conference*

133.    On September 14, 2022, Defendant Bharadwaj attended the Goldman Sachs Communacopia Technology Conference. During the Q & A session, a member of Goldman Sachs' Research Division noted that a conference attendee was "dying to ask" Defendants about the "the macroeconomic conditions [that] are not that cooperative," and in particular, "[w]hat are you seeing out there with the demand environment?" Defendant Bharadwaj replied that Atlassian has many "advantages in the overall macroeconomic climate" that insulates the Company from poor global conditions, and that the Company provides "mission-critical" software for customers at "highly, highly competitive" prices.[2]

134.    Defendant Bharadwaj then spoke about "what different parts of our business are seeing what impact." Regarding Atlassian's "conversion of users from free to paid," Defendant Bharadwaj explicitly assured investors that the "slight" dip in free-to-paid conversions was only a "bit of softness over the past couple of months;" that the slight drop did not signify a negative trend or had a material impact on Atlassian; and that it was "important to illustrate" that free-to-paid was "really a very small part of our business," with more than 90% of Atlassian's revenue stemming from already-existing customers. Importantly, Defendant Bharadwaj told investors that "across the board, across existing and new customers, Atlassian was not enduring a material negative trend from poor macroeconomic conditions:

> [W]e look at various different parts, cohorts of a funnel to think about, hey, what different parts of our business are seeing what impact?

---

[2]Additionally, a former contractor who had worked in the Marketing and Analytics Department at Atlassian from November 2020 until November 2021 was interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as "CW 2." CW 2 represented that "Atlassian had one of the best data monitoring systems" he ever worked with. CW 2 maintained that the Company held weekly video conferences every Monday headed by Head of Marketing Analytics, Amy Ren. These weekly meetings discussed Atlassian's trends, including revenues-both incremental and top line-as well as trends in the growth of paying customers. In addition to these weekly meetings, Chief Marketing Officer Robert Chatwani held quarterly meetings with sales and marketing teams to discuss the same topics. CW 2 also stated that Atlassian's data was up to date as things were instantly updated in the Company's internal dashboard system, which management could access.

Just in the last shareholder letter, we talked about conversion of users from free to paid. We are seeing a bit of softness over the past couple of months. But it's important to illustrate that point in the overall picture as over 90% of our revenue comes from existing customers. So the conversion from free to paid is really a very small part of our business. And also, the number of free users that are coming in that create new free instances continues to grow steadily. We're not seeing any trends there. So across the board, across existing and new, that's overall what we are seeing in different parts of the business.

135. Further, when analysts inquired whether the slowdown in free-to-paid conversions would force the Company to "catch up" in the future when "demand environment is more stable," Defendant Bharadwaj strongly replied that Atlassian was not enduring any issues regarding demand, and regarding any part of Atlassian's business, the Individual Defendants "haven't really seen any discernible trend there in terms of the macroeconomic impact":

Yes. So from a product perspective, again, I want to reiterate that we think of it as both new and existing and over 90% of the revenue comes from existing. So there's a corresponding weightage we think about when we think about, hey, which parts of the funnel should we look at and what to optimize from a product perspective? So in the over 90% bucket, which is where most of the revenue comes from, there are several different parts of the funnel we look at. So we look at migrations, which is currently on year two of a multiyear journey. That continues to go steadily. It is where we would expect to be at this point in the journey. So we monitor the rate of migration, what kinds of customers are migrating and we're pretty pleased with where we are there. . . we look at upsell or upgrades. So the people that started out with a free when they switch to standard, what happens?

So to address your question, the way our pricing model works is the first 10 users are free, and then the 11th user onwards, it's paid. . . . *So we think of upsell as really across free to standard, standard to premium, premium to enterprise. And we've seen some very encouraging progress there over the last four quarters. And I haven't really seen any discernible trend there in terms of the macroeconomic impact.* And user expansion, which is unique to the Atlassian model of organic growth, user expansion is a place where we don't go off and try to do – try to influence that using a bunch of levers. We let that happen organically because that's how we believe we construct our long-term sustainable business model with low CAC. That's an area that we continue to monitor. That's not an area where we try to do a lot of product interventions, but that's going to be an important one to look at in the current climate.

136. The day after Defendant Bharadwaj spoke at the conference, on September 15, 2022, Morgan Stanely stated that "Atlassian has seen little impact from the weakened macro environment."

137. The statements in paragraphs ¶¶ 133-136 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

Specifically, contrary to Defendant Bharadwaj's statements--which occurred with only two weeks left in the Company's quarter—that the Individual Defendants were "not seeing any trends" and had not "really seen any discernible trend" regarding "the macroeconomic impact," in actuality, the absolute opposite was true. In fact, the Individual Defendants later admitted when the truth was revealed, that at the same time Defendant Bharadwaj made these positive statements, Atlassian was experiencing "a decrease in the rate of Free instances converting to paid plans" was a material "trend" that "became more pronounced in Q1" and would have an "impact" on "future revenue growth." Additionally, it was materially misleading for Defendant Bharadwaj to claim that there was no "discernible trend" regarding Atlassian's existing customer base when the Individual Defendants admitted they were already witnessing a "trend" of a "slowing in the rate of paid user growth" at the time of these statements. Importantly, the Individual Defendants admitted that they had seen these material negative "trends" affecting the Company's business since July 2022. For these reasons, it was false and materially misleading for Defendant Bharadwaj to assert that she disclosed all known macroeconomic impacts "across the board, across existing and new" and that she revealed "overall what we are seeing in different parts of the business," without discussing these trends. Moreover, given these known material negative trends, the Individual Defendants had no basis at all to characterize to the market an entirely positive picture of the Company's financial results and future guidance.

### October 4, 2022 Post-Effective Amendment to Registration Statement

138.    On October 4, 2022, Atlassian filed a Post-Effective Amendment to its Registration Statement (the "Amendment") with the SEC, pursuant to the Company's July 2022 domicile change to the United States. Both Defendant Cannon-Brookes and Defendant Farquhar signed the Amendment.

139.    The Amendment explicitly included Atlassian's 2022 Annual Report, stating that the Company was "not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions."

140.    The statements in paragraphs ¶¶ 138-139 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1)  macroeconomic conditions were detrimentally impacting the Company's business model; (2) the Company was facing slowing conversions from free users to paying customers and that these occurrences established a negative trend for the Company; (3) the Company was experiencing a slow-down in paying customer growth; (4) the Company failed to maintain internal controls; and (5) as a result, Defendants statements regarding the performance and financial condition of Atlassian were materially false and misleading at all relevant times. The statements made in paragraphs ¶¶ 138-139 were also false and misleading for the same reasons set forth in paragraph ¶ 137.

### The Truth Emerges

***November 3, 2022 Q1 2023 Shareholder Letter***

141.    On November 3, 2022, after the market closed, the Company filed a Form 8-K with the SEC that contained Atlassian's first quarter of 2023 shareholder letter ("Q1 2023 Shareholder Letter"). The Q1 2023 Shareholder Letter stunned the market, revealing that Atlassian's first quarter of 2023 cloud growth was just 49%, which fell far short of analysts' expectations of mid 50s growth. The letter also disclosed that it would have to cut back its guidance for full year cloud growth and the Company missed its guidance for earnings per share for the first time in its history as a public company.

142.    Importantly, in total opposition to the Individual Defendants' previous statements, including statements made just two weeks prior, that Atlassian was no experiencing any material negative macroeconomic trends, the Company now revealed that the total opposite was true: both parts of Atlassian's business had been materially affected by macroeconomic conditions through Atlassian's first quarter of 2023. In particular, in the Q1 2023 Shareholder Letter, the Individual Defendants conceded that they needed to discuss "the topic that's top of mind for shareholders: macro impacts." The Individual Defendants than conceded that the Company's poor financial performance were the direct result of "two trends [that were] the result of companies tightening their belts and slowing their pace of hiring." These

trends were (1) "a decrease in the rate of Free instances converting to paid plans," and (2) "a slowing in the rate of paid user growth from existing customers."

143.    The Q1 2023 Shareholder Letter further discussed macroeconomic trends, making it clear that these conditions were affecting the Company, contrary to the Individual Defendants prior representations:

> [W]e encountered two primary revenue headwinds during the quarter from changes in the macroeconomic environment: 1) We saw a more pronounced continuation of the trend discussed last quarter, where fewer Free instances converted to paid plans; and 2) we also saw the growth of paid users from existing customers slow in the second half of Q1, largely due to customers slowing their rate of hiring.

***November 3, 2022 Conference Call***

144.    Moreover, while the Individual Defendants first tried to claim that these negative trends only materialized "towards the end of the quarter," these claims fell on deaf ears in the market. During the call on November 3, 2022, an analyst stated that "[i]nvestors were pretty surprised to see results like this from Atlassian." The analyst also stated that he "[had] to believe that [Atlassian] had a very early warning" about the negative trends since the Individual Defendants had previously stated that Atlassian's business was linear, which provided a "predictable sales model" that separated Atlassian from its competitors. Additionally, the linearity gave the Individual Defendants "tremendous visibility" into sales pattern:

> Gregg Steven Moskowitz
> Mizuho Securities USA LLC, Research Division
>
> So I think of Atlassian as an unusual software company in a good way, a couple of the reasons being that one, your quarters are typically very linear. And two, you have tremendous visibility into customer buying and usage patterns. And so I'd have to believe that you had a very early warning of the paid user growth slowdown that began midway through the quarter.

145.    In responding to questions from stunned investors and analysts during the call, Defendant Deatsch clarified "the timing of things that we saw." Concerning the free-to-paid customer slump, Defendant Deatsch admitted that this "trend definitely came through throughout the quarter," and further admitted that the Individual Defendants had seen the trend "going into August" —i.e., July 2022. And concerning the decrease in existing "user growth" Defendant Deatsch conceded that the Individual Defendants had seen this negative trend in July, which was the first month of the Company's quarter, and

even before the Relevant Period begins. He further revealed that this trend ran into August as well, with "user growth slow[ing] down across [Atlassian's] customer base":

> Cameron Deatsch
> Chief Revenue Officer
>
> I can also add on to just the timing of things that we saw. As we mentioned in August, what we were seeing in the August time frame was the net new customers, the free customers converted to paid was slowing down going into August. We normally through our summer season, the July and August tend to see user growth slow down across our customer base, largely due to seasonality, vacations and holidays.

146.    Since answering in this fashion eviscerated the truth of the Individual Defendants prior statements that they had no knowledge of negative trends in Atlassian's business, Defendant Deatsch, offered a new excuse. For the first time, he claimed that instead of Atlassian's business being linear, it was instead "seasonal," and that because of this, the Individual Defendants expected a firm rebound in September when people came back from their vacations and holidays:

> It just tends to be a normal seasonal trend where July and August are slower as people are not upgrading instances, adding more users. What we noticed is usually most years when you come back in September, everyone is coming back to work, the holidays wear off and people start adding users and upgrading their instances again and that's when we actually did not see that normal user growth uptick that we normally do in September.

147.    On this shocking news, the Company stock price fell $50.44, or almost 30%, from a closing of $174.17 per share on November 3, 2022, to close at $123.73 per share on November 4, 2022, while also erasing over $7 billion in shareholder value. The Company's price per share continued to drop in the trading day as the market continued to process the new information, dropping another 4% on November 7, 2022, to close at $119.23 per share.

148.    Analysts were perplexed by the Individual Defendants disclosures, and appropriately and clearly explained that they were directly at odds with what the Individual Defendants previously told investors. BMO Capital reacted to the developments by lowering its target price for Atlassian by 45% while stating it was "surprised by the magnitude of the slowdown in consolidated growth and cloud growth more particularly," and highlighting that this was "the first time Atlassian has not exceeded upper-end of guidance in at least five years."

149.    Wolfe Research, who just three months prior was so impressed with the Individual Defendants "reaffirmation of basically zero impacts from macro," lowered its price target for Atlassian's shares by 40%, from $290 to $175 per share, while stating the "abrupt change in tone and outlook likely puts shares in the penalty box." Wolfe further stated that the Company's leadership of "headwinds from both free to pay conversion and a slowing rate of paid user growth at existing customers" "took us and investors by surprise, sending shares down ~25% AH [after hours]."

150.    Likewise, Citi put Atlassian "in the penalty box" for its "significant and unexpected pivot in demand tone," and stated that the "unfortunate surprise" of negative trends would put "significant pressure" on Atlassian stock, and that the cutbacks in full-year cloud growth guidance was "another unfortunate surprise."

151.    Other analysts greatly reduced their target price for Atlassian shares too. Piper Sandler dropped its rating for Atlassian to neutral and reduced its price target by $135 per share, or 48%. Oppenheimer & Co. dropped its price target to $200 from its previous mark of $320, as it "expect[ed] the pronounced reset of Atlassian's near-term performance… to weigh sharply on the shares as investors realign expectations." Similarly, Morningstar reduced its price target for Atlassian by 44% because of "worsening conversions of free users" and "decelerating seat growth." FBN Securities cut its price target by 57% from $350 to $150, once it considered the now disclosed "macro headwinds."

**The Individual Defendants' Knowledge**

152.    The Individual Defendants knew, or were reckless in not knowing, that the Company was misinforming the market about the negative trends from macroeconomic conditions that were detrimentally affecting the Company's business.

153.    The Individual Defendants' admissions when the truth emerged substantiate that they were aware of negative trends since at least July 2022 and that these negative trends continued throughout the first quarter. A strong inference can be drawn that the Individual Defendants knew, or recklessly disregarded, that Atlassian was suffering from negative trends due to macroeconomic conditions. For instance, the Individual Defendants admitted in a November 3, 2022 conference call that the "timing of

things we saw" started in July 2022. By admitting seeing the trends in July 2022, the Individual Defendants implicitly confirmed that the statements made in August, September, and even on October 4, 2022, were knowingly materially false and misleading.

154. Additionally, the Individual Defendants boasted that they personally watched trends and customer data closely, "like a hawk." This confirms their direct knowledge of information that was contradictory to their public statements at the time they were made. Repeatedly, before and during the Relevant Period, the Individual Defendants told the market that Atlassian management was involved in monitoring trends. For instance, at an August 2021 conference, the Company's management stated that they had "visibility into every click," and would "study" trend "information very carefully." Similarly, in a May 27, 2021 presentation, Defendant Deatsch stated that he and Defendants Farquhar and Cannon-Brookes (who both served on the Board) personally monitored "bookings," "customer numbers," and "usage and adoption metrics." Throughout the Relevant Period, Defendant Deatsch stated that the Individual Defendants were "being exceedingly vigilant across watching all stages of our funnel, whether that's migrations funnel, the additions upgrades, retention rates and, of course, our new customers coming in," and that they would "continue to watch like a hawk." Defendants Farquhar and Cannon-Brookes comforted investors that they would "continue to scan the horizon for warning signs and be candid with investors as we have throughout our six+ years as a public company." Defendant Bharadwaj assured investors that Defendants would "continue to monitor" trends in "user expansion," which was "an important one to look at in the current climate."

155. The Individual Defendants also touted Atlassian's "linear sales cycle" which provided the Individual Defendants with almost real-time Company performance, including negative trends. In every annual report since becoming a public company, Atlassian represented that the Company's "linear quarterly sales cycle" gave Atlassian strong "[p]redictability of sales" and "steady and predictable revenue," which made the Company "radically different" than other software competitors and insulated it

from macroeconomic conditions. Further, just before the commencement of the Relevant Period, in June 2022, the Company assured investors that the "elephant in the room" (i.e., volatile macroeconomic conditions) was not affecting the Company due to Atlassian's "beautiful linearity throughout our quarter."

156. The Individual Defendants were also cognizant that the market was greatly relying on the Company's public statements, before and during the Relevant Period, since analysts and investors repeatedly inquired about macroeconomic conditions affecting Atlassian and how Atlassian's representations were "diametrically opposite" from Atlassian's competitors. Indeed, even before the Relevant Period, the Individual Defendants knew that investors were greatly interested in their representations about macroeconomic conditions, as shown from a June 7, 2022 fireside chat, when an analyst explicitly asked "to touch on macro" as "it's something that's obviously on everyone's mind." The following day, on June 8, 2022, another analyst began a conversation by saying that "I got to ask the question on the macro, just to start." These types of questions proliferated during the Relevant Period. For instance, on August 4, 2022, an analyst asked during a conference call whether the Company saw demand "weakness" given the current environment. Later in the same call, another analyst asked about the "macro impact that you are seeing in the business." Similarly, during the September 14, 2022 Goldman Sachs conference, one analyst was "dying" to ask a question about how the "macroeconomic conditions" were affecting the "demand environment." The Individual Defendants replied by boasting about the Company's "unique" and "differentiated" business model, saying that Atlassian had an advantage over competitors, while also completely denying the existence of macroeconomic impacts on the Company.

157. The Individual Defendants also repeatedly referenced that Atlassian's revenue primarily came from existing customers, "the over 90% bucket . . . where most of the revenue comes from." Thus, the Individual Defendants would have been aware of the conditions and trends affecting Atlassian's financial survival.

158.    Lastly, the Individual Defendants were well aware that they were required to abide by Item 303 of Regulation S-K. The SEC, in the 2021 amendments to Item 303 and in the edits to Form 20-F, states that the rule is designed to allow investors to view companies "through the eyes of management." In turn, company management has the "responsibility…to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company." The amended Form 20-F states that company management "must identify material recent trends," and "must discuss, for at least the current financial year, any known trends [or] uncertainties … that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations … or that would cause reported financial information not necessarily to be indicative of future operating results." Vitally, management must analyze "short term results as well as future prospects." Therefore, certain of the Individual Defendants had a legal duty to monitor, identify, and disclose negative trends that were affecting Atlassian's revenues, even in the short term, while others were given oversight responsibilities to ensure such action and compliance was occurring. Despite this, the Individual Defendants chose to positively mispresent the existence of known adverse trends to the market.

## **Insider Sales**

159.    Defendants Cannon-Brookes and Farquhar made insider sales, detailed above, at prices artificially inflated by the false and misleading statements at issue for collective proceeds exceeding $66 million.

160.    Those sales that occurred shortly before or after the Individual Defendants caused the Company to issue false and misleading statements contribute to an inference that these Individual Defendants knew of the falsity of the statements and were cashing in while the Company's common stock continued to trade at artificially inflated prices.

161.    For instance, both Defendant Cannon-Brookes and Defendant Farquhar made identical trades in identical amounts of 8,614 shares per trade on many of the trading days throughout October 2022, with the last trades occurring just one day before the truth was revealed.

162.    This short burst of selling is indicative of Defendant Cannon-Brooke's and Defendant Farquhar's knowledge that the Individual Defendants were propping up Atlassian's stock price on false and misleading information.

163.    The timing and amounts of these insider sales, made while the price of the Company's common stock was artificially inflated, further demonstrate that the Individual Defendants, including those who serve on the Board, knew of the falsity of the statements made and that those Individual Defendants who made insider sales were using this knowledge to enrich themselves while the Company's common stock remained inflated.

## DAMAGES TO ATLASSIAN

164.    As a direct and proximate result of the Individual Defendants' misconduct, Atlassian has lost and expended, and will continue to lose and expend, many millions of dollars.

165.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and four Individual Defendants and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

166.    Such expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

167.    As a direct and proximate result of the Individual Defendants' conduct, Atlassian has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

168.    Plaintiff brings this action derivatively and for the benefit of Atlassian to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as

directors and/or officers of Atlassian, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof.

169.    Atlassian is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

170.    Plaintiff is, and has been at all relevant times, a shareholder of Atlassian. Plaintiff will adequately and fairly represent the interests of Atlassian in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

171.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.    A pre-suit demand on the Board is futile and, therefore, excused. Atlassian' Board currently consists of the following ten individuals: Defendants Brown, Cannon-Brookes, Farquhar, Fernandez, Goodarzi, Parikh, Salem, Sordello, Wong, and Zatlyn (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten directors that were on the Board at the time this action was filed.

173.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to investigate the charges impartially and decide whether to pursue action against themselves and the other perpetrators of the scheme.

174.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Atlassian to issue materially false and misleading statements. Specifically, the Director-Defendants caused Atlassian to issue false and misleading statements which were intended to make Atlassian appear more profitable and attractive to investors. As a result of the

foregoing, demand would be futile, and thus excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

175.    Additional reasons that demand on Defendant Cannon-Brookes is futile follow. Defendant Cannon-Brookes is currently the Company's Co-CEO, co-founder, and one of its directors. Together with Defendant Farquhar, he possesses over 86 percent of the Company's voting power, making him a controlling shareholder. Thus, as the Company admits, he is a non-independent director. As Co-CEO, a director, and controlling shareholder throughout the Relevant Period, Defendant Cannon-Brookes was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Cannon-Brookes' insider sales, which yielded approximately $33.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Cannon-Brookes is a defendant in the Securities Class Action. For these reasons, too, Defendant Cannon-Brookes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Farquhar is futile follow. Defendant Farquhar is currently the Company's Co-CEO, co-founder, and one of its directors. Together with Defendant Cannon-Brookes, he possesses over 86 percent of the Company's voting power, making him a controlling shareholder. Thus, as the Company admits, he is a non-independent director. As co-CEO, a director, and controlling shareholder throughout the Relevant Period, Defendant Farquhar was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. As one of the Company's highest officers and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant

Farquhar's insider sales, which yielded approximately $33.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Farquhar is a defendant in the Securities Class Action. For these reasons, too, Defendant Farquhar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since November 2015 and as the Chair of the Board since April 2018. Defendant Brown also serves as a member of the Compensation and Leadership Committee. Defendant Brown has received and continues to receive lucrative compensation for her role as a director and as chair of the Board as described above.[3] As the trusted chair of the Company's Board, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Brown breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Fernandez is futile follow. Defendant Fernandez has served as a Company director since November 2015. Defendant Fernandez also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Additionally, Defendant Fernandez has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Fernandez

---

[3] Like the other Director-Defendants, Defendant Brown's compensation is above the average amount that non-employee directors receive at large-cap companies. *See* https://www.fwcook.com/content/documents/Publications/22-12 19_FWC_2022_Director_Comp_Final.pdf (explaining that the average compensation for these non-employee directors from a 2022 survey was $300,000).

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Goodarzi is futile follow. Defendant Goodarzi has served as a Company director since April 2018. He also serves as the chair of the Compensation and Leadership Committee. Defendant Goodarzi has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Goodarzi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Parikh is futile follow. Defendant Parikh has served as a Company director since July 2013. He also serves as a member of the Compensation and Leadership Committee. Defendant Parikh has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Parikh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant Salem is futile follow. Defendant Salem has served as a Company director since July 2013. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Salem has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these

reasons, too, Defendant Salem breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Sordello is futile follow. Defendant Sordello has served as a Company director since November 2015. He also serves as the chair of the Audit Committee. Defendant Sordello has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sordello breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as a Company director since July 2010. He also serves as the chair of the Nominating and Corporate Governance Committee. Defendant Wong has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Zatlyn is futile follow. Defendant Zatlyn has served as a Company director since September 2021. She also serves as a member of the Audit Committee. Defendant Audit has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Zatlyn breached her fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

185.    Additional reasons that demand on the Board is futile follow.

186.    Defendants Salem, Sordello, Fernandez, and Zatlyn (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

187.    Demand in this case is further excused because the Director-Defendants are beholden to Defendants Cannon-Brookes and Farquhar, who are Company co-founders, Co-CEOs, directors, and controlling shareholders in the Company. Both Defendant Cannon-Brookes and Defendant Farquhar each own 54,717,824 Class B shares of Company common stock as of June 30, 2022, or 43.94% of the total voting power of the Company. Together, they control over 86% of the voting power of Atlassian. Thus, their substantial holdings and their continued presence on the Board and as the Company's Co-CEOs make them significant shareholders who exercise outsized voting power over almost all facets of the Company. In light of Defendants Cannon-Brookes and Farquhar's significant control of the Company, the Director-Defendants cannot impartially consider a demand against either Defendant Cannon-Brookes nor Defendant Farquhar, who are interested, primary wrongdoers, as their continued employment with the Company is partly contingent on Defendants Cannon-Brookes and Farquhar's decisions. Thus, the Director-Defendants are unable to evaluate a demand with disinterest or independence as a result of Defendants Cannon-Brookes and Farquhar's significant voting influence and overall power.

188.     Defendants Brown, Goodarzi, and Parikh (the "Compensation and Leadership Development Committee Directors") served as members of the Compensation and Leadership Development Committee during the Relevant Period. The Compensation and Leadership Development Committee "has full power to select" who receives awards under the 2015 Share Incentive Plan (the "2015 Plan"), including themselves. Therefore, the Director-Defendants are beholden to the Compensation and Leadership Development Committee Directors because the Compensation and Leadership Development Committee Directors have complete discretion over determining whether and to what extent awards under the 2015 Plan would be made to the Director-Defendants given that these awards provide the Director-Defendants with a significant portion of their compensation annually.

189.     In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

190.     Atlassian has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Atlassian any part of the damages Atlassian suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

191.     The acts complained of herein constitute violations of fiduciary duties owed by Atlassian's officers and directors, and these acts are incapable of ratification.

192.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Atlassian. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Atlassian, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

193.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

194.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Atlassian to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

195.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against Individual Defendants for Breach of Fiduciary Duties

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Atlassian's business and affairs.

198.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

199.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Atlassian.

200.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Atlassian's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1)  macroeconomic conditions were detrimentally impacting the Company's business; (2) the Company was facing slowing conversions from free users to paying customers and that these occurrences established a negative trend for the Company; (3) the Company was generally experiencing a slow-down in paying customer growth; and (4) the Company failed to maintain internal controls. As a result, Defendants statements regarding the performance and financial condition of Atlassian were materially false and misleading at all relevant times.

201.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

202.     Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

203.    In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of ***over $66 million***, while the

price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

204.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

205.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

206.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Atlassian has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

207.    Plaintiff, on behalf of Atlassian, has no adequate remedy at law.

### SECOND CLAIM
### Against Individual Defendants for Unjust Enrichment

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Atlassian.

210.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Atlassian that was tied to the performance or artificially inflated valuation of Atlassian, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

211.    Plaintiff, as a shareholder and representative of Atlassian, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

212.    Plaintiff, on behalf of Atlassian, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

213.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Atlassian, for which they are legally responsible.

215.    As a direct and proximate result of the Individual Defendants' abuse of control, Atlassian has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216.    Plaintiff, on behalf of Atlassian, has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

217.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

219.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

220.    Plaintiff, on behalf of Atlassian, has no adequate remedy at law.

## FIFTH CLAIM

**Against Defendants Cannon-Brookes, Farquhar, Bharadwaj, and Deatsch for Contribution Under Sections 10(b) and 21D of the Exchange Act**

221.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.     Atlassian, Defendant Cannon-Brookes, Defendant Farquhar, Defendant Bharadwaj, and Defendant Deatsch are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Cannon-Brookes', Farquhar's, Bharadwaj's, and Deatsch's willful and/or reckless violations of their obligations as officers and/or directors of Atlassian.

223.     Defendants Cannon-Brookes, Farquhar, Bharadwaj, and Deatsch, because of their positions of control and authority as officers and/or directors of Atlassian, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Atlassian, including the wrongful acts complained of herein and in the Securities Class Action.

224.     Accordingly, Defendants Cannon-Brookes, Farquhar, Bharadwaj, and Deatsch are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

225.     As such, Atlassian is entitled to receive all appropriate contribution or indemnification from Defendants Cannon-Brookes, Farquhar, Bharadwaj, and Deatsch.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Atlassian, and that

Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Atlassian;

(c)     Determining and awarding to Atlassian the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Atlassian and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Atlassian and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Atlassian to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Atlassian restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 6, 2023                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
eitank@bgandg.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Patricia Capistrano, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31 day of August, 2023.

DocuSigned by:

*Tricia Capistrano*

24CFABC50A3C433...

Patricia Capistrano